IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| ROBERT OSBORNE AND MARINA BAY TRANSPORTATION, L.L.C., <br><br> Plaintiffs, <br><br> vs. <br><br> C.H. ROBINSON COMPANY, <br><br> Defendant. | Case No. 08 C 50165 <br><br> Judge <br> Frederick Kapala <br><br> Magistrate Judge <br> P. Michael Mahoney |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Osborne ("Osborne") is the sole member of Marina Bay Transportation, L.L.C. ("Marina Bay"), a local trucking operation. Defendant, C.H. Robinson Company, is a shipping and warehousing company that contracts with local companies as part of its operation. Plaintiff's complaint alleges that an employee of Defendant promised Plaintiff certain "lock down business" – in excess of $1 million in "gross/net" proceeds – if Plaintiff made certain investments to create warehousing facilities. Plaintiffs allege they made the investments, but Defendant stopped delivering the lock down business after only a few months, causing Plaintiff to suffer financial losses on their investments.

As discovery has unfolded, there have been allegations that Osborne attempted to bribe Defendant's employee for the "lock down" business, and counter-allegations that it was Defendant's employee that solicited the bribes after Plaintiff was already on the hook for the improvements to his facilities. Plaintiff believes that the promised "lock down business" was directed to other companies, and has attempted to discover what comparable shipping business

went through other customers or warehouse locations. The discovery dispute in this case resulted from difficulties Plaintiff had in getting Defendant to search for and turn over records for comparable companies and locations.

Because of the extended difficulties the parties have had with discovery throughout this case, a summary of the motions filed and court orders is helpful. On July 2, 2010, Plaintiff filed a motion to compel because Defendant's discovery responses were overdue. The court granted the motion in part on July 23, 2010. When Defendant tendered discovery, it did not answer certain requests, and stated that some documents were voluminous and only available for inspection at it's headquarters in Eden Prairie, Minnesota. Seeking to avoid traveling to Minnesota for document inspections, Plaintiff's counsel sent letters on July 30, 2010 and August 6, 2010 asking whether the voluminous documents were available in electronic formats, and if so, what formats. On August 24, 2010, Plaintiff filed a motion for contempt, alleging that Defendant had not answered supplemental production requests or Plaintiff's inquiries as to the electronic production of the voluminous documents. The documents Defendant described as voluminous were supposedly documents responsive to requests for shipping records relating to three companies: Suncraft, Master Graphics, and Dixon Web. The court granted the motion in part at a September 17, 2010 hearing based on Defendant's counsel's representation that his client thought the documents could be produced electronically, and that they would attempt to do so. The court reserved ruling on the portion of Plaintiff's motion requesting attorney's fees.

On October 1, 2010, Defendant sent Plaintiff thousands of pages of PDF files consisting of records relating to Suncraft. There were no records relating to Master Graphics or Dixon Web produced. Over the course of status hearings with the court on October 8, 2010, October 29,

2010, and November 24, 2010, the parties exchanged information to explain the difficulties with the search and to clarify the requests for information as to Master Graphics or Dixon Web. Plaintiff sought answers as to how and why Defendant performed its searches, and the court suggested that Plaintiff could proceed with a Rule 30(b)(6) deposition. Defendant explained that Dixon Web and Master Graphics were, in fact, "pick-up locations" rather than "customers," which is what Defendant believed Plaintiff was seeking. Counsel for Defendant stated that pick up locations often have varying names, like "E&D Web" or "Dixon Direct" rather than "Dixon Web." The court ordered Defendant to perform a general query of its database for "Dixonweb" and "Master Graphics." On December 12, 2010, Defendant produced information as a result of the clarifications made during the October and November hearings. All materials were produced as individual PDF documents.

On December 13, 2010, Defendant filed a motion for a protective order in response to Plaintiff's notice for a 30(b)(6) deposition. The court granted Defendant's motion in part and converted two of the three deposition topics to interrogatories. Plaintiff maintained that Defendant's answers did not explain the difficulties in obtaining the documents as to Dixon Web and Master Graphics and insisted that the documents should have been provided in a more usable format. Through March and April of 2011, the parties engaged in discovery relating to Defendant's electronic search efforts. Plaintiff issued a supplemental interrogatory and took the depositions of two employees of Defendant, Mr. Wilson and Mr. Lyons. It was after this discovery process that Plaintiff filed the discovery motions currently before the court.

On April 15, 2011, Plaintiff filed a second motion to compel Defendant to turn over information on the electronic database of Defendant and also sought the production of previously

turned-over PDF documents in a more usable format. The court denied that part of the second motion to compel seeking more usable electronic information based on Defendant's assertion that it had already created a response in a more appropriate format and was turning it over to Plaintiff. On April 28 2011, Plaintiff filed a second motion for contempt encompassing many of the same issues described above. Plaintiff also filed a motion to compel depositions and a third motion to compel Defendant to answer Plaintiff's supplemental interrogatories on May 5, 2011 and May 6, 2011, respectively. The court placed the motion for contempt, second motion to compel, and motion to compel depositions on a consolidated briefing schedule. Plaintiff also filed a motion for reconsideration of the court's ruling on the second motion for contempt, which the court assumes was meant to refer to the second motion to compel. All of the above has been fully briefed by the parties.

Plaintiff's combined briefing on the various discovery motions culminated in a request for a default judgment as a discovery sanction. A sanction that would serve as a final judgment in a case is dispositive, and was therefore referred to the District Court. *See Egan v. Freedom Bank, et al.*, No. 10-1214, slip. op. at 11 (7th Cir. Oct. 6, 2011). Recognizing that such a remedy should be used as a sanction "only in extreme situations, or when other less drastic sanctions have proven unavailing," the District Court held on September 9, 2009 that Plaintiff's motion for a default judgment should be denied. (Minute Order of Sept. 9, 2011, Dkt. No. 103.) The case was referred back to the Magistrate Judge for further ruling on whether lesser sanctions are appropriate.

The discovery issues before the court related to electronic discovery procedures. It does not appear that the parties anticipated the need to establish an electronic discovery protocol for

4

this case.  Since this case was initiated, the Seventh Circuit Electronic Discovery Committee has developed a Proposed Standing Order relating to the discovery of electronically stored information[1].  The Proposed Standing Order, in conjunction with the Sedona Principles, offer insight as to ideal ways for litigants to proceed once the need for electronic discovery has been identified.

Principle 2.05 of the Proposed Standing Order refers to the process for the parties to identify electronically stored information.  It suggests that the parties should discuss how to filter data based on file type, date ranges, sender, receiver, custodian, search terms, or other similar parameters.  It also suggests that the parties should discuss using keyword searching, mathematical or thesaurus-based topic or concept clustering, or other advanced culling technologies[2].  Regarding production format, Principle 2.06 suggests that the parties should make a good faith effort to agree on the format(s) for production of ESI.  Principle 2.06(b) states:

> [t]he parties should confer on whether ESI stored in a database or a database management system can be produced by querying the

---

[1] Discovery Pilot:  Seventh Circuit Electronic Discovery Pilot Program, www.discoverypilot.com (last visited October 20, 2011).  The Program Committee for the Seventh Circuit Electronic Discovery Pilot Program was formed in May 2009 "to conduct a multi-year, multi-phase process to develop, implement, evaluate, and improve pretrial litigation procedures that would provide fairness and justice to all parties" while at the same time reducing the cost and burden of electronic discovery.

[2] Principal 2.05(b) contains a non-inclusive list of topics for discussion between the parties.  The entire Proposed Standing Order can be accessed through the Seventh Circuit Electronic Discovery Pilot Program website, at http://www.discoverypilot.com/sites/default/files/StandingOrde8_10.pdf (last visited October 17, 2011).

>                    database for discoverable information, resulting in a report or a
>
>                    reasonably usable and exportable electronic file for review by the
>
>                    requesting counsel or party.

Overall, the emphasis of the Proposed Standing Order is that the parties should proactively engage in a good faith discussion as to the most reasonable and efficient means to search and produce electronic information.

      Similarly, the Sedona Principles[3] contain guidance as to how parties should proceed with electronic discovery. Comment 4.a indicates that requests for production should clearly specify what electronically stored information is being sought, while avoiding "the sort of blanket, burdensome requests for electronically stored information that invite blanket objections and judicial interventions." *The Sedona Principles, Second Edition* (2007), Cmt. 4.a. Where the parties have not previously agreed on a production format, the producing party may either produce the information in the format in which it is ordinarily maintained, or a form that is reasonably usable. *Id.*; Fed. R. Civ. P. 34(b)(2). The responding party has a similar obligation to make specific objections or to indicate the extent to which the requested production will be limited by undue burden or cost of production. *The Sedona Principles, Second Edition* (2007), Cmt. 4.b. Where a requesting party has not specified a form or forms for the requested production, or if the responding party objects to the form requested, "the responding party must identify the form or forms it intends to use." *Id.* The parties should attempt to reach an

---

[3]*The Sedona Principles, Second Edition: Best Practices, Recommendations and Principles for Addressing Electronic Document Production* (The Sedona Conference Working Group Series, 2007).

agreement on the forms of production based on the various needs of the parties concerning the data. *The Sedona Principles, Second Edition* (2007), Cmt. 12.b.

Electronic discovery was not addressed at the Rule 26(f) conference in this case, and there is no indication that the parties reached any type of agreement on the matter. The potential for electronic discovery arose when Plaintiff inquired as to whether it could be used as an alternative to an on-site document inspection. The court views the Seventh Circuit Electronic Discovery Program and the Sedona principles as guideposts by which the parties actions should be judged once they engaged in electronic discovery.

Plaintiff's counsel initially raised the possibility of electronic discovery in letters to Defendant's counsel dated July 30, 2010 and August 6, 2010. Both letters asked what information would be available in electronic format. The August 6, 2010 letter further suggested that certain information might be appropriately tendered in a format previously used by the parties, while other information might be more useful in "Excel format or as tab or comma separated values as it regards billing to the customers." (Pl's Brief in Support, Dkt. No. 85, Ex. G & H.) Defendant offers no explanation as to why it did not respond to Plaintiff's counsel's letters regarding electronic discovery. Defendant has also failed to explain why it took until October 1, 2010, the date upon which it turned over thousands of PDF documents responsive to the Suncraft request, to inform Plaintiff that it found no documents responsive to the Master Graphics and Dixon Web requests.

As described above, the parties spent the next few months attempting to sort out issues with regard to the Master Graphics and Dixon Web discovery requests. Plaintiff issued supplemental interrogatories and took depositions of at least two of Defendant's employees

regarding their electronic searches and production. Defendant presented a number of explanations to account for the delays and confusion in producing responsive documents to Plaintiff in a usable format.

As to the search for records relating to Dixon Web, Defendant argues that it accurately represented the fact that a search for "Dixon Web" as a customer in its database yielded no results. The reasons put forward for the lack of results were that Dixon Web was a "pick-up location" rather than a "customer," and that pick-up locations often were referenced using various aliases. For example, the Dixon Web entity was referred to in Defendant's database as "Dixonweb Publishing" and "Dixon Direct." Therefore, a search for the exact words "Dixon Web" yielded no results. Defendants emphasize that Plaintiff never asked for a search of aliases related to Dixon Web, nor did he ask for a search to be performed based on a customer number or any other criteria.

Plaintiff believes that Defendant, or at least some of its employees, knew what Plaintiff was looking for as early as July of 2010. On July 9, 2010, Mr. Wilson sent an email to Mr. Lyons with the Subject line "Here is the info needed for the Marina Bay lawsuit." The email appears to list information necessary to search for all carriers that shipped for Suncraft, Dixon Web, and Master Graphics, along with information about loads, invoices for shipments, and bills of ladings as to each entity. Next to each entity listed in the email is a customer number. (Pl's Brief in Support, Dkt. No. 85, Ex. K.) Plaintiff attached an exhibit to his memorandum showing a spreadsheet with the results of a search for the customer number listed next to Dixon Web in Mr. Wilson's email. The spreadsheet lists nearly 300 loads for the customer names "Dixon Direct" and "Dixonweb Publishing". (Pl's Brief in Support, Dkt. No. 85, Ex. AE.) Plaintiff also

discovered a spreadsheet created on July 19, 2010 that lists the search results for a "Warehouse Load History" as to a Customer called "E&D Web, Inc.". (Pl's Brief in Support, Dkt. No. 85, Ex. M.) Finally, Plaintiff emphasizes that he never labeled Dixon Web as a customer. Rather, his discovery request sought billing records sent from Defendant "to the customer for shipment of printed material *from* Dixon Web, Master Graphics or Suncraft where Marina Bay Transport was the carrier during 2007" (emphasis added).

Defendant's explanations as to Dixon Web do not tend to show a good faith effort to work out discovery issues with Plaintiff. The evidence shows that Defendant recognized what Plaintiff was looking for as early as July 9, 2010. Defendant also knew that Dixon Web was referred to using various aliases, including "Dixon Direct," "Dixonweb Publishing," and "E&D Web, Inc." in its internal databases. In fact, Defendant's employees were able to search and produce Excel databases based on its own internal information. How would Plaintiff know that the term Dixon Web would be insufficient to refer to all Dixon Web aliases that Defendant chose to use? Mr. Wilson's email actually refers to "Dixon Web," whereas the attached databases refer to "Dixon Direct" or "Dixonweb Publishing." Even after Defendant was presented with one of its own "Load Confirmation" documents containing information for "Dixonweb Printing," it did not turn over documents to Plaintiff. It appears that Defendant opted to wait for Plaintiff to try to guess the precise search terms and categories that Defendant should use to search its database for an entity that Defendant already knew how to find. The court is persuaded that Defendant knowingly made the process more difficult when it chose not to communicate with Plaintiff once it made initial discoveries relating to the Dixon Web entities.

Turning to Master Graphics, Defendant appears to rest on the explanation that it believed

Plaintiff was looking for a "customer" with that name. As with Dixon Web, Plaintiff never described Master Graphics as being a customer. Defendant argues it was technically true that no customer records for Master Graphics were identified during the initial search of the customer field of the database. It is undisputed that Defendant knew of a warehouse identification number for Master Graphics as early as the July 9, 2010 email. It was Defendant's choice to limit its search to the "customer" field of its searchable data. Without information about Defendant's search capabilities, Plaintiff was not obligated to request the precise name and search category for an entity, down to capitalization and spelling, as it is stored in Defendant's system.

It was not until after a November 24, 2010 hearing before the court that Defendant was able to locate responsive records in electronic format. At the hearing, the court ordered Defendant to conduct a general query using the search terms "Dixonweb" and "Master Graphics." The type of discussion that took place in court is exactly the type that the Sedona Principles and the Seventh Circuit Electronic Discovery Program contemplate the parties having in good faith. Once the court ordered the general query, the documents were produced in less than three weeks. The court finds that neither party followed ideal practices regarding electronic discovery. However, the evidence shows that Defendant had pertinent information, knew what Plaintiff was looking for, knew how to retrieve it, and knowingly prolonged the process by not engaging in reasonable communications with Plaintiff.

As of December 12, 2010, Plaintiff had received documents responsive to his requests relating to Dixon Web and Master Graphics. Plaintiff wanted the requested information in order to perform certain calculations, such as the amounts Defendant paid to similar carriers or billed to other customers in the same region. Defendant produced the information as individual PDF

files, which Plaintiff would have to manually inspect in order to recreate his own usable file. Defendant maintained the information in a searchable format that was capable of performing calculations. It was not an unreasonable request for Plaintiff to seek information in either the same format that Defendant keeps it or a similarly manipulable format. *See U.S., ex rel. Liotine v. CDW Government, Inc.*, 2011 WL 1576555, at *3 (S.D. Ill. Apr. 26, 2011) (ordering a defendant to produce sales data contained in a database in the same format or a similarly manipulable format as the defendant kept it).

Plaintiff filed a motion to compel on April 15, 2011 seeking production of the electronic documents in a usable format. The motion was presented on April 27, 2011, at which time counsel for Defendant conveyed how Defendant operated a proprietary computer system that did not produce documents that would be readable on a regular personal computer. Defense counsel described how a custom script would have to be created and run on Defendant's computer system in order to collect and export data to an Excel file. This process was said to take a certain amount of "horsepower" and only certain employees were authorized to extract the information. In its written response to Plaintiff's motion, Defendant emphasized that it would create usable files at its own expense in order to comply with Plaintiff's request. Based on Defendant's response, the court denied Plaintiff's motion to compel. Plaintiff continued to pursue the matter through its second motion for contempt, believing that Defendant was not forthright about the difficulties, or lack thereof, in turning over usable files.

The court will not revisit its ruling on the second motion to compel, as it appears Plaintiff's counsel received what he was seeking. Plaintiff's concerns as to the delays in receiving usable information merit further consideration. Specifically, Plaintiff produced

deposition testimony from two of Defendant's employees familiar with the searches in this case. Mr. Lakotish testified that a custom script can be run in Defendant's computer program to perform certain searches. (Pl's Brief in Support, Dkt. No. 85, Ex. AH.) The results of a search would appear in an "output grid" that an individual with the right credentials would have the option of exporting to an Excel file. (*Id.*) The resulting Excel file would be created automatically and would have rows and columns of data. (*Id.*) Mr. Lyons testified that in July of 2010, Mr. Wilson asked him to run queries on certain customer and carrier codes and to pull documentation such as bills of lading and invoice data. (Pl's Brief in Support, Dkt. No. 85, Ex. AI.) Mr. Lyons was able to search the data and send it to Mr. Wilson in Excel format, but he was unable to pull up all of the attached documents. (*Id.*) The process of exporting the data to Excel was described as "very simple." (*Id.*).

Nevertheless, Defendant believes it fulfilled its obligations by producing documents in PDF format. Defendant cites to Comment 12.b. of the Sedona Principles in support of a theory that production in PDF or Tagged Image File ("TIFF") format is a presumptively reasonable format for electronic production. The Sedona Principles acknowledge that electronic information can be transmitted in many forms, and some are more useful than others depending on the circumstances. *The Sedona Principles, Second Edition* (2007), Cmt. 12.b. PDF and TIFF files have a static format that can be advantageous, but they can also be time consuming to create and lose searchable text and metadata that might enable the parties to more efficiently digest the information. *Id.* Plaintiff was apparently looking for information he could use to make calculations and comparisons. Under the circumstances, turning over thousands of PDF files without first communicating with Plaintiff was not presumptively reasonable.

The court believes the parties could have resolved their issues regarding the data searches and production had they conferred in good faith. Had Plaintiff's counsel initially agreed to travel to Defendant's office in Minnesota, he might have obtained the data he was looking for, or at least gained an understanding of Defendant's search capabilities. Defendant should have responded to Plaintiff's written inquiries about the potential for electronic discovery. Electronic discovery is often an iterative process and the parties should allow for refinement of search terms as their understanding of the issues develops. *The Sedona Principles, Second Edition* (2007), Cmt. 11.a. The parties should also discuss how the materials may be produced. Plaintiff attempted to open a dialogue with his letters and requests. Defense counsels' delayed representations about the difficulties involved in producing data to Plaintiff do not align with the straightforward answers given by Defendant's employees. It is also inconsistent with the fact that Defendant's employees had conducted relevant searches and created usable Excel documents more than nine months prior to turning similar information over to Plaintiff. Plaintiff should not have needed to take depositions from Defendant's employees in order to learn how Defendant's data could be produced.

Plaintiff contributed to the delays in this case by aggressively pursing motions to compel and for sanctions when there may have been opportunities for more amicable resolutions. Plaintiff filed his second motion to compel in an attempt to get usable electronic discovery from Defendant. While presenting this motion, Plaintiff informed the court he would be filing a second motion for contempt regarding the electronic discovery issues. Within ten days of filing the second motion for contempt, Plaintiff filed a motion to compel depositions and a third motion to compel seeking responses to his discovery requests related to Defendant's electronic

production efforts. On May 11, 2011, the court continued Plaintiff's motions and ordered the parties to conduct a Local Rule 37.2 conference, including telephonic participation from Mr. Lakotish, regarding discovery issues. The parties conducted the conference, and counsel for Defendant followed-up in an email to Plaintiff attempting to resolve some of the issues. Defense counsel suggested that it was working to deliver the materials that Plaintiff was seeking, and that the parties could work together to "get this case back on track." Plaintiff opted to push forward with his motions. Portions of each of Plaintiff's motions contain overlapping allegations, or sought relief that had already been requested. For example, Plaintiff's second motion to compel, second motion for contempt, and third motion to compel all sought sanctions based on Defendant's conduct. Plaintiff's duplicative motion practice may have diverted the parties' efforts away from finding reasonable solutions to discovery issues.

In summary, Defendant was late in responding to some of Plaintiff's discovery requests, and failed to respond to Plaintiff's good faith attempts to open a dialogue about electronic discovery. There is also evidence that Defendant knew what Plaintiff was seeking, but was deliberatively evasive and caused unnecessary delay prior to disclosing the requested information. Defendant's actions were not in line with the letter or spirit of the Federal Rules of Civil Procedure, the Proposed Standing Order from the Seventh Circuit, or the Sedona Principles describing best practices for electronic discovery. *See* FED. R. CIV. P. 37(a)(4); Discovery Pilot: Seventh Circuit Electronic Discovery Pilot Program, Proposed Standing Order, Principle 2.06, www.discoverypilot.com (last visited October 20, 2011). Based on Defendant's conduct, the court will award reasonable attorney's fees related to Plaintiff's efforts to obtain the electronic discovery he was seeking in a reasonably usable format.

In determining what constitutes reasonable attorney's fees, the court will take into consideration Plaintiff's actions in filing unnecessarily repetitive discovery motions. Plaintiff was correct about Defendant's delay and misinformation regarding certain discovery, but Plaintiff failed to mitigate litigation costs once counsel for Defendant made efforts to retrieve all of the information Plaintiff was seeking in order to get the case back on track. Plaintiff should not be awarded fees or expenses for costs incurred while briefing duplicative or repetitive motions. *See, e.g. Jacobeit v. Rich Tp. High School Dist. 277*, 2011 WL 2039588, at *8 (N.D. Ill. May 25, 2011) (finding a sanction of fees appropriate, but limiting fees based on overly inclusive and repetitive submissions by the plaintiff).

In light of all of the above, the court finds as follows:

1. Plaintiff's motion for contempt filed on August 24, 2010 is granted as to Plaintiff's request for reasonable attorney's fees. The court finds that this motion, which was filed after Defendant failed to respond to two of Plaintiff's letters, was successful in getting Defense counsel to speak with his client regarding electronic discovery.

2. Plaintiff's second motion for contempt, filed on April 28, 2011, is granted in part. This motion encompassed all or nearly all of the discovery violations that the court finds Defendant committed. Defendant is to pay all of Plaintiff's attorney's fees and costs associated with filing and presenting this motion. The motion is denied as to all other relief sought by Plaintiff.

3. Plaintiff's motion to compel depositions of Dave Lyons and a Rule 30(b)(6) deponent is denied. The relief sought in this motion was sought in Plaintiff's

      second motion for contempt, and is otherwise moot. Plaintiff shall not be reimbursed for any fees or costs associated with this motion.

4. Plaintiff's third motion to compel is denied. This motion requests that Defendant produce electronic discovery in a usable format, which was addressed in Plaintiff's second motion for contempt and mooted by Defendant's eventual production. The motion also seeks answers to Plaintiff's supplemental interrogatories, which Defendant did attempt to answer, or otherwise mooted through the production of employees for depositions.

5. Plaintiff's motion for reconsideration of the court's denial of Plaintiff's second motion for contempt, which the court takes as a motion pertaining to Plaintiff's second motion to compel, is denied.

6. Defendant is ordered to pay Plaintiff's reasonable attorney's fees and costs associated with taking the depositions of Mr. Lyons and Mr. Lakotish.

Plaintiff is to file an affidavit in support of his request for reasonable fees and costs by December 1, 2011.

**E N T E R:**

_____
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: October 25, 2011